Filed 6/28/23  P. v. Marconnet CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C095774 |
| Plaintiff and Respondent, | (Super. Ct. No. 21FE008909) |
| v. | |
| VINCENT MARCONNET, | |
| Defendant and Appellant. | |

SUMMARY OF THE APPEAL

Defendant Vincent Marconnet appeals from the judgment imposed following his conviction for robbery (Pen. Code, § 211 – statutory section citations that follow are found in the Penal Code unless otherwise stated) and a true finding that he personally used a deadly weapon, a knife (§ 12022, subd. (b)(1)).  On appeal, defendant contends: (1) the trial court abused its discretion under section 1385 by failing to afford great weight to the age of his prior conviction in determining whether to strike the five-year prior serious felony enhancement; (2) the personal use enhancement must be reversed because the jury was prejudicially instructed with an incorrect legal theory; and (3) the

1

trial court abused its discretion in imposing the middle term.  The People claim the failure

to double defendant's sentence after denying the motion to strike his prior strike

conviction under *People v. Superior Court* (*Romero*) (1996) 13 Cal. 4th 497 (*Romero*)

resulted in an unauthorized sentence.  The People agree the trial court erred in instructing

the jury as to the personal use enhancement, but contend the error was harmless.  We

conclude the record reflects the trial court did not understand the scope of its discretion in

sentencing.  We further conclude the instructional error on the personal use enhancement

was prejudicial.  Accordingly, we will reverse the personal use enhancement, vacate the

sentence, and remand for further proceedings.

### FACTS AND HISTORY OF THE PROCEEDINGS

S.S. was living at an extended stay hotel when he met Melissa M.  Melissa stayed

with S.S. for a couple of weeks, until he caught her stealing quarters from him and kicked

her out.  She left, taking all of her belongings.  He did not hear from Melissa again,

although he saw her around the hotel in a white sedan.

S.S. had multiple computers, a gaming console, clothes, and marijuana in the hotel

room.  S.S. testified he had obtained the electronics when he got "$16,000" handed to

him from the Employment Development Department (EDD) due to the pandemic.  He

also testified he owned a landscaping business and kept the equipment at his mother's

home.

On March 1, 2021, S.S. had been up for three days, using methamphetamine.  He

also had been smoking marijuana daily.  At 1:00 a.m., he heard a knock at the door.

Without looking through the peephole or the window just to the left of the door, he

opened the door.  Defendant and another man were standing at the door, claiming to be

hotel management.  S.S., familiar with hotel management, knew the men were not hotel

management.  Defendant asked S.S. if his name was "[S.S.]," a "red flag" went off in

S.S.'s head, and he immediately tried to shut the door.  Defendant put his arm between

the door jamb and door to prevent S.S. from shutting the door.  S.S. tried to slam the door

2

shut, using all his body weight, trying to break defendant's arm. He was frightened. Defendant told S.S. he was a friend of Shiloh's, a person S.S. knew from the hotel. When he heard Shiloh's name, S.S. opened the door.

Once S.S. opened the door, he saw defendant pull out a knife and a taser. At trial, S.S. described the knife as a hunting knife, specifically 16 to 18 inches from handle to tip, with approximately a 12-inch blade. One side of the blade was smooth and the other was serrated.

After coming approximately one foot inside the room, S.S. testified defendant swung the knife at him two or three times, moving and leaning toward him. S.S. was able to avoid being hit by jumping back two to three feet. Defendant then identified himself as "Skinner" and said he would do anything for his girlfriend, "Melissa." While defendant was swinging the knife at him, the taller man was taking items such as the Pi, a laptop, and some cords. Defendant then grabbed S.S.'s laptop and PlayStation. Defendant was holding the knife and the laptop in the same hand. Seeing the laptop was password protected, they demanded the password and threatened to torture S.S. with the taser. S.S. just chuckled at them. He did not give them the password. Defendant told S.S. not to move, took the laptop and the PlayStation, and walked out of the room with them in his hands. The men left behind a desktop computer and a virtual reality helmet for the PlayStation. S.S. told law enforcement the men had also taken one and a half pounds of marijuana.

A hotel security guard saw two men smoking near S.S.'s room on the third floor; a tall man and a man about 5 feet 6 inches. A short while later, he was asked to go to the third floor to check out a noise and the two men passed him on the stairs, ran to the parking lot, and threw themselves into a white car driven by a woman.

The entire incident lasted approximately two to three minutes. S.S. called the front office and the office called law enforcement. S.S. denied speaking with law

3

enforcement on the phone at any point. When a recording of the call to law enforcement was played, S.S. acknowledged speaking with the police department.

Sacramento County Deputy Sherriff John Higley responded to the scene and took S.S.'s statement. S.S. was upset, animated and very "amped up"; it took some time for him to calm down enough to gather information for the report. His demeanor was also consistent with someone under the influence of methamphetamine.

S.S. told Higley that one of the robbers had referred to himself as "Skinner" and that he knew Melissa had dated someone with that name. Based on that information, Higley found defendant. He created a photographic lineup and S.S. identified defendant from that lineup.

Higley described the hotel room as a small room with one bed. It appeared the room had been ransacked. Given the size of the room, Higley opined it would be difficult for a person to avoid being struck by someone trying to hit them.

When S.S. spoke with Higley, S.S. did not describe the knife as a hunting knife. S.S. told Higley defendant had not made any motion toward him with the knife or taser. S.S. never mentioned defendant tried to punch him with the taser, swung the knife at him, or that he jumped back two to three feet to avoid being hit. S.S. reported that the taller suspect was the one who took the laptops and defendant did not take anything. S.S. did not tell Higley that defendant put his arm through the door and S.S. tried to slam the door shut on defendant's arm. S.S. did not mention any physical injuries or complain of any pain. S.S. told Higley defendant took approximately one-half pound of marijuana from the room, and Higley agreed that was a lot of marijuana for personal use. Although S.S. made some corrections to the written summary of his statement to Higley, he did not correct the portions about defendant trying to hit him with the taser and swinging the knife at him or as to which man took the property from the room.

To Higley's knowledge, the taser and knife "had [n]ever been seized."

4

S.S. had prior felony convictions for manufacturing a controlled substance, felony child abuse, and felony unlawful starting a fire.  S.S.'s brother, Don, testified that in his opinion, S.S. is not truthful or honest; he is a "scam artist" who regularly lies.  S.S. had previously borrowed money from Don claiming it was for his child, but instead spent the money on drugs.  S.S. applied for unemployment benefits in Oregon, despite having never lived there.  He also falsely claimed his EDD card had been stolen, in an attempt to be reimbursed for money he had already spent.  Don also testified S.S. did not have a landscaping business or keep landscaping equipment at their mother's home.

Defendant was charged with robbery (§ 211) and a personal use of a deadly weapon, a knife, enhancement allegation (§ 12022, subd. (b)(1)).  It was further alleged that defendant sustained a prior serious felony conviction (§ 667, subd. (a) – "nickel prior") and a prior strike conviction (§§ 667, subds. (b)-(i), 1170.12).  The same prior conviction served as the basis for each of these allegations.  A jury found defendant guilty of robbery and found true the personal use of a deadly weapon allegation.  In bifurcated proceedings, the trial court found the prior conviction allegations true.

The trial court sentenced defendant to the midterm of three years, plus five years for the nickel prior enhancement.  The trial court struck the punishment for the prior serious felony conviction and the personal use of a knife enhancement.  The trial court awarded defendant 301 days of presentence custody credit and imposed various fines and fees.

## DISCUSSION

## I

### *Sentencing*

The parties raise several claims of sentencing error.  Defendant argues the trial court erred in not affording great weight to the age of his prior strike conviction under section 1385, subdivision (c).  Defendant also contends the trial court abused its

discretion in refusing to consider mitigating circumstances as to both his motion to strike and the imposition of the middle term. The People argue the trial court imposed an unauthorized sentence when, after determining defendant did not fall outside the Three Strikes law, it did not impose the Three Strikes sentence.

We note neither party objected to the sentence imposed or argued in the trial court that it erred in imposing its sentence. Nor did the People appeal on the basis of an unauthorized sentence. Generally, these failures would forfeit the claims on appeal. (*People v. Scott* (1994) 9 Cal.4th 331, 356; *People v. Burke* (1956) 47 Cal.2d 45, 54, disapproved on other grounds in *People v. Sidener* (1962) 58 Cal.2d 645, 647.) The record of sentencing reflects several sentencing errors which show the court misunderstood the scope of its sentencing discretion. These errors potentially impacted both parties and these issues were raised in the parties' briefing and arguments before sentencing. Accordingly, we will exercise our discretion to address the merits of each of the claimed sentencing errors.

A. Background

Before sentencing, defendant filed a statement in mitigation, a motion to strike the prior conviction under section 1385, and points and authorities regarding the amendments to sections 1170 and 1385. Defendant's arguments set forth the recent amendments to section 1385, including additional factors to consider in dismissing an enhancement under subdivision (c), and changes to section 1170, which limit the trial court's discretion to impose the upper term (§ 1170, subds. (b)(1), (2)) and mandate imposition of the lower term in certain circumstances (§ 1170, subd. (b)(6)).

Defendant argued the trial court should dismiss his prior strike in furtherance of justice given his prior strike conviction was over 30 years old, was committed when he was only 18 years old, and he had a "relatively nonviolent" criminal history. Under section 1385, subdivision (c), defendant argued his prior conviction should be dismissed

6

as it was more than five years old. Defendant also argued under section 1385, subdivision (c), that the court was required to dismiss all but one of the enhancements.

In addition, defendant raised mitigating factors in his statement in mitigation. He asserted he had a turbulent childhood which included: being physically abused by two of his stepfathers; sexually abused by one stepfather; leaving home at 13 years old due to the sexual abuse; and living with prostitutes until he was 16 or 17 years old. He also began using drugs at eight years old. The drugs were given to him by his older brother and foster children living in his home.

The People submitted on the aggravating factors. The People argued defendant's long and significant criminal history, combined with the seriousness of the current offense brought him within the spirit of the Three Strikes law. The People also argued the prior strike conviction was not an enhancement, rather as part of the Three Strikes law it was part of an alternative sentencing scheme, therefore, it was not included within section 1385, subdivision (c).

With respect to the appropriate term, the court said, since the People had submitted on the issue of aggravating factors, it was limited to imposing either the lower or middle term. The court went on to state since there was no evidence supporting mitigating factors beyond the statements by defense counsel in his statement in mitigation, it would impose the middle term.

As to striking the prior strike conviction, the court observed the 52-year-old defendant had been sentenced to, although not served, 22 years in prison, and been granted, although not served, 11 years of probation. The court noted defendant's criminal history was not particularly violent; the violent offenses being: the 30-year-old strike when defendant was 18 years old; a "minor scuffle" approximately 25 years before; and the current offense. But the court acknowledged defendant had a history of "lots of recidivism." The court concluded it could not find defendant fell outside the Three Strikes law, and stated it was denying the *Romero* motion.

7

But, the court continued, that was not the end of the inquiry, as there was a new law "where it's even more difficult to evaluate the new law and the requirements by the legislature that there are certain things I shall do and certain things that I must consider and afford great weight to the evidence offered." The court concluded, "it's really a clash between enhancements to a determinate sentencing scheme and the three strikes law." "So after considering what is in the furtherance of justice in this case, the Court is not imposing any penalty for the enhancement that the jury found of [defendant] personally using a deadly or dangerous weapon as the Court does find that that would be imposing multiple enhancements. [¶] The question remains on whether the Court can both impose a five-year nickel prior for the prior strike in 1988, that prior conviction, and double what the court is now determining is the most appropriate in this case of the triad, the midterm. [¶] There is no case law to answer this question on whether applying three strikes is applying a sentencing enhancement the same as a nickel prior is also applying a sentencing enhancement. [¶] I think there is [a] policy reasons [*sic*] to apply the three strikes law and the nickel prior, but the Court is going to decline to do so. [¶] But I am going to choose the middle term and add five years for the nickel prior for a sentence of eight years in state prison, recognizing that [defendant] could have had It doubled under the three strikes law. [¶] I'm going to exercise my discretion to weigh and evaluate the appropriate sentence in this case and eight years does seem appropriate for a violent crime such as this in light of all of the circumstances."

B.    Analysis

The parties " 'are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court. [Citations.] A court which is unaware of the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.' [Citation.] In such circumstances, . . . the

8

appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.) "[A] discretionary sentencing decision rendered by a judge who did not understand what [they were] doing would not be sustainable as a proper exercise of discretion." (*In re Large* (2007) 41 Cal.4th 538, 550.)

### C.    Section 1170

Effective January 1, 2022, Senate Bill No. 567 amended section 1170. Section 1170, subdivision (b)(6) makes the low term the presumptive sentence under a variety of circumstances if those circumstances contributed to the commission of the offense unless the court finds that aggravating circumstances outweigh the mitigating circumstances and imposition of the lower term would be contrary to the interests of justice. (§ 1170 subd. (b)(6)). These "low-term" circumstances include whether the person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence. (§ 1170, subd. (b)(6)(A).)

A statement in mitigation is a proper vehicle to present additional facts to the court. (§ 1170, subd. (b)(4); *People v. Slater* (1989) 215 Cal.App.3d 872, 875.) A defendant may submit a statement in mitigation to present additional facts or dispute facts in a probation officer's report. The court may consider the statements in mitigation submitted by the defendant, as well as any further evidence introduced at the sentencing hearing. (§ 1170, subd. (b)(4); Cal. Rules of Court, rule 4.420.)

Because of COVID-19, the probation officer did not interview defendant and obtain information as to his background or social history. (Cal. Rules of Court, rule 4.411.5(a)(4), (a)(6) [probation report must include "[a]ny statement made by the defendant to the probation officer, or a summary thereof, including the defendant's account of the circumstances of the crime" and "any relevant facts concerning the

9

defendant's social history[,]" including "[f]actors listed in section 1170(b)(6)"].) Defendant's statement in mitigation provided relevant additional facts regarding defendant's social history and factors under section 1170, subdivision (b)(6), including possible physical and sexual abuse, and childhood trauma. Apparently relying on the proof requirements as to aggravating circumstances in section 1170, the court concluded defendant was required to provide evidence of mitigating circumstances beyond counsel's statements in mitigation to support imposition of the lower term. Unlike the statutory requirements regarding circumstances in aggravation, there are no such statutory requirements as to circumstances in mitigation. Thus, the trial court erred in refusing to consider defendant's statement in mitigation in exercising its discretion.

In addition, although not raised by the parties, the record reflects the trial court misunderstood its sentencing discretion as to imposition of an upper term. Section 1170, subdivisions (b)(1)-(3) now prohibit trial courts from considering aggravating circumstances to justify an upper term sentence, unless the facts underlying each aggravating factor have been established by one of three prescribed methods: (1) "the facts underlying those circumstances have been stipulated to by the defendant[;] or [(2)] have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial" (§ 1170, subd. (b)(2)); or (3) the court may "consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury." (§ 1170, subd. (b)(3).) The People submitted on the aggravating factors. To submit a matter is to "end the presentation of further evidence in . . . and tender a legal position for decision." (Black's Law Dictionary (11th ed. 2019) p. 1725.) Submitting a matter on the record is not, as the court apparently thought, a concession that there were no properly proven aggravating factors. Nor was such a statement true as a matter of law. Under section 1170, subdivision (b)(3), the court could have relied on the certified records of defendant's prior conviction contained in the certified 969(b) packet and a certified RAP sheet admitted before the court as to

10

prior conviction allegations to impose the upper term. Thus, the trial court misunderstood the scope of its discretion when it stated it was limited to the lower or middle term.

### D. *Section 1385*

A trial court may strike a prior serious felony conviction only if the defendant falls outside the spirit of the Three Strikes law. (*People v. Williams* (1998) 17 Cal.4th 148, 161; *People v. Strong* (2001) 87 Cal.App.4th 328, 337-338.) In deciding whether to strike a prior conviction pursuant to section 1385, the trial court "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*Williams*, at p. 161.)

Effective January 1, 2022, Senate Bill No. 81 amended section 1385 to add specific mitigating factors the trial court must consider when deciding whether to strike enhancements from a defendant's sentence in the interest of justice. (§ 1385, subd. (c); *People v. Sek* (2022) 74 Cal.App.5th 657, 674.) Section 1385, subdivision (c) now provides: "(1) Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute. [¶] (2) In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances . . . are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety."

11

The trial court here noted at the time of sentencing there was no case law on whether applying the Three Strikes law was applying a sentencing enhancement under section 1385, subdivision (c), like a "nickel prior is also applying a sentencing enhancement." Although the court believed there were policy reasons to apply both, the court declined to do so.

In the time since sentencing in this case, we have filled that legal void. In *People v. Burke* (2023) 89 Cal.App.5th 237, 244, based on the plain language of the statute, we held that section 1385, subdivision (c) applies to enhancements. The Three Strikes law is not an enhancement, but an alternative sentence for the current offense. Since the Three Strikes law is not an enhancement, section 1385, subdivision (c)'s provisions do not apply to it. Because section 1385, subdivision (c) does not apply to the Three Strikes law, the court failed to exercise its discretion.

Although the trial court understood that it had some discretion in sentencing, there are several points at which the record reflects the trial court misunderstood the scope of that discretion. In addition, the record does not clearly indicate that the trial court would have imposed the same sentence had it been aware of the full scope of its discretion. At the very least, the record is ambiguous as to whether the court understood its sentencing discretion and obligations, certainly "some of the trial court's comments during sentencing raise serious doubts in that regard. In the face of such an ambiguous record, it is appropriate to remand the matter to the trial court to consider the matter under the correct standard, to the extent it has not already done so." (*People v. Lua* (2017) 10 Cal.App.5th 1004, 1021.)

As defendant notes in his reply brief, because the numerous errors in the court's exercise of its discretion require us to remand the matter for resentencing, we need not address defendant's claim as to whether the trial court failed to afford great weight to the age of defendant's prior conviction in determining whether to strike the five-year prior conviction enhancement.

## II

### *Instructional Error on Enhancement Allegation*

Defendant contends the true finding on the personal use of a deadly weapon enhancement allegation must be reversed because the jury was instructed with a legally incorrect theory. Specifically, the pattern instruction allowed the jury to find the enhancement true if it concluded either the weapon used was inherently deadly or was used in such a way as to make it deadly; but, a knife is not an inherently dangerous weapon. The People agree the instruction was in error, but argue the error was harmless. We are not persuaded.

### A.     Additional background

The trial court instructed the jury on the personal use of a dangerous or deadly weapon with pattern instruction CALCRIM No. 3145. As relevant, the court instructed: "A deadly or dangerous weapon is any object, instrument, or weapon that is inherently deadly or dangerous or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury. [¶] An object is inherently deadly if it is deadly or dangerous in the ordinary use for which it was designed. [¶] In deciding whether an object is a deadly weapon, consider all the surrounding circumstances, including when and where the object was possessed, and any other evidence that indicates whether the object would be used for a dangerous, rather than a harmless, purpose. [¶] Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm. [¶] Someone personally uses a deadly or dangerous weapon if he or she intentionally does any of the following: [¶] 1. Displays the weapon in a menacing manner; [¶] OR [¶] 2. Hits someone with the weapon." (Italics omitted.)

In closing argument, the People argued both legal theories. As to the knife, the People stated, "I'm not going to spend much time on the [deadly weapon] allegation. We

13

all heard her Honor describe the law.  [¶]  A weapon -- or, excuse me, an object is inherently deadly if it is deadly or dangerous in the ordinary use for which it was designed.  [¶]  *Certainly a knife, a hunting knife, any kind of knife and a taser are inherently dangerous in the purpose for which they were used and designed.*  [¶]  Did the Defendant display the weapon in a menacing manner.· Again, we know this.· We heard this in the 911 call.· Deputy Higley told us this.· And, again, [S.S.] told us this on the stand. [¶]  Being punched at with a taser and swung at with the knife.· *These are dangerous weapons.  That's not in dispute here*.· That's not what this trial is about."  (Italics added.)

The defense closing argument relied heavily on challenging S.S.'s credibility, characterizing him as "completely wholly indisputably unreliable."  Defense counsel argued S.S. was a drug addict, under the influence of methamphetamine at the time of the robbery, a perjurer, and a scam artist.  Defense counsel continued, S.S. had a character for untruthfulness, as testified to by his brother, and had sustained multiple felony convictions.  Defense counsel also pointed out discrepancies in S.S.'s testimony about the room and the robbery, in particular his statements to Higley regarding whether defendant was merely holding the weapons or trying to punch him with the taser and swinging the knife at him.

    B.    Analysis

An " ' "inherently deadly or dangerous" ' " weapon is a term of art describing objects that are deadly or dangerous in " ' "the ordinary use for which they are designed," ' " that is, weapons that have no practical nondeadly purpose.  (*People v. Stutelberg* (2018) 29 Cal.App.5th 314, 318-319.)  Because a knife has ordinary, innocent purposes such as cutting food or other items, it is not an inherently deadly weapon.  (*People v. Aledamat* (2019) 8 Cal.5th 1, 6 (*Aledamat*).)  It may, however, be a deadly weapon when used in a manner capable of causing and likely to cause death or great

14

bodily injury. Because, as a matter of law, a knife is not an inherently dangerous weapon, we agree with the parties that the trial court erred by "presenting the jury with two theories by which it could find the [knife] a deadly weapon: (1) inherently or (2) as used. The first theory (inherently) is incorrect, but the second theory (as used) is correct." (*Aledamat*, at p. 7.) Thus, the issue in this case is whether this error was prejudicial.

If a trial court instructs the jury on alternative theories of guilt, one of which is valid and one of which is "legally inadequate," we evaluate prejudice under the harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24. (*Aledamat*, *supra*, 8 Cal.5th at p. 3.) We "must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, [we] determine[ ] the error was harmless beyond a reasonable doubt." (*Aledamat*, at p. 3.) The question is not whether we believe it clear beyond a reasonable doubt that the defendant is guilty under the legally correct theory, but whether we can say, beyond a reasonable doubt, that the legally incorrect jury instruction did not taint the actual jury verdict. (*People v. Thompkins* (2020) 50 Cal.App.5th 365, 399.) Among the ways in which we may assess the error is by reviewing what the jury necessarily found, as well as the parties' arguments, including whether the prosecutor relied on the invalid legal theory in closing arguments. (*People v. Baratang* (2020) 56 Cal.App.5th 252, 263-264.)

We cannot conclude this error was harmless beyond a reasonable doubt. The prosecution's limited argument on the nature of the knife as a weapon explicitly stated the knife was an inherently dangerous weapon and that the issue was not in dispute. A rational jury could conclude that the prosecutor's erroneous assertion that the defendant's possession of a knife while committing the robbery meant he committed the offense with a deadly weapon, irrespective of how the knife was used.

15

Further, although S.S.'s trial testimony that defendant swung the knife at him could have served as the basis for finding defendant had used the knife as a deadly weapon, given the challenges to S.S.'s credibility, we cannot conclude beyond a reasonable doubt that the jury would have necessarily reached this conclusion. When speaking with law enforcement after the robbery, S.S. said defendant did not make any motion toward him with the knife or taser, and never mentioned defendant swung the knife at him, or that he jumped back two to three feet to avoid being hit. He also did not describe the knife as a hunting knife. Nor did S.S. testify as to how close defendant was when swinging the knife and could not describe how defendant swung the knife. And, Higley opined based on the size of the room, it would be difficult to avoid being struck by someone swinging a knife. In addition to these discrepancies in S.S.'s pretrial statements and trial testimony, there were other significant challenges to S.S.'s credibility: he had multiple prior convictions; his brother, testified that in his opinion, S.S. is not truthful or honest; he is a "scam artist" who regularly lies; and S.S. was a drug addict who had been up for three days prior to the robbery using methamphetamine.

With the instructional error, the jury could have disbelieved S.S.'s testimony as to how the knife was used yet still found the enhancement true, based on the misclassification of the knife as an inherently deadly weapon. Given the factual uncertainty as to whether defendant used the knife in a manner likely to cause serious physical injury, we cannot say that a properly instructed jury would have found that defendant necessarily used the knife in a deadly or dangerous manner. (*People v. Stutelberg*, *supra*, 29 Cal.App.5th at pp. 318-319.) Accordingly, we must reverse the personal use of a deadly weapon enhancement.

## DISPOSITION

The judgment of conviction of the robbery is affirmed. The personal use of a deadly weapon enhancement is reversed. The sentence is vacated. The matter is

16

remanded for further proceedings to allow the prosecution to retry defendant on the deadly or dangerous weapon use allegation, if they elect to do so, and for resentencing. Upon resentencing, the court may not impose a sentence greater than the one originally imposed.

 

HULL, Acting P. J.

We concur:

EARL, J.

BOULWARE EURIE, J.